
AUG - 5 2019
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

HENRY NICHOLAS GEORGE, )
)
    Petitioner, )
)
v. ) Civil Action No. 3:18CV707–HEH
)
HAROLD W. CLARKE, )
)
    Respondent. )

## MEMORANDUM OPINION
(Granting Respondent's Motion to Dismiss)

Henry Nicholas George, a Virginia inmate proceeding with counsel, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1) challenging his convictions in the Circuit Court for the City of Williamsburg and James City County ("Circuit Court"). Respondent has moved to dismiss. (ECF No. 5.) George did not file a response. For the reasons that follow, the Motion to Dismiss will be granted.

### I. PROCEDURAL HISTORY

Following a jury trial, the Circuit Court convicted George of rape, abduction with intent to defile, and forcible sodomy. *Commonwealth v. George*, Nos. CR12021946, CR12021947, CR12021948, at 1 (Va. Cir. Ct. May 7, 2013). The jury recommended a total sentence of 30 years, the minimum sentence it could impose. *Id.*; (ECF No. 1, at 2). Thereafter, the Circuit Court imposed a sentence of 30 years. *Commonwealth v. George*, Nos. CR12021946, CR12021947, CR12021948, at 2 (Va. Cir. Ct. May 7, 2013). George

appealed his convictions. The Court of Appeals of Virginia and the Supreme Court of Virginia rejected George's appeal. *George v. Commonwealth*, No. 150711, at 1 (Va. Dec. 28, 2015); *George v. Commonwealth*, No. 0034–14–1, at 1 (Va. Ct. App. Oct. 30, 2014).

Thereafter, George, by counsel, filed a petition for a writ of habeas corpus with the Circuit Court wherein he asserted that counsel had failed to provide effective assistance in conjunction with a plea offer. Petition for a Writ of Habeas Corpus at 3, *George v. Clarke*, No. CL16–2255 (Va. Cir. Ct. filed Dec. 28, 2016). Following an evidentiary hearing, the Circuit Court denied George's Petition for a Writ of Habeas Corpus. *George v. Clarke*, No. CL16–2255, at 1 (Va. Cir. Ct. Aug. 2, 2017). George appealed. The Supreme Court of Virginia refused George's petition for appeal. *George v. Clarke*, No. 180154, at 1 (Va. July 16, 2018).

On October 14, 2018, George filed his § 2254 Petition with this Court wherein he claims he is entitled to relief because:

> Counsel failed to provide adequate advice on the pros and cons of accepting or rejecting the plea[] offer. If counsel had taken the necessary time to fully discuss the pros and cons of going to trial by jury versus the pros and cons of taking the plea for aggravated sexual battery, including complete candor concerning the strength of the evidence for and mostly against him regarding all the charges and the likely outcomes, the Petitioner would have accepted the offer to plead guilty to aggravated sexual battery with the sentence to be decided by the judge.

(§ 2254 Petition 13 (emphasis omitted).)

## II. APPLICABLE CONSTRAINTS UPON FEDERAL HABEAS REVIEW

To obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") further circumscribes this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Given the foregoing restrictions, the findings of the Circuit Court figure prominently in this Court's opinion.

## III. ANALYSIS

### A. George's Claim

Prior to George's trial, the prosecution offered to dismiss the pending charges in exchange for George pleading guilty to aggravated sexual battery. (§ 2254 Pet. 21.) "The sentencing range for aggravated sexual battery was one to twenty years under Virginia Code § 18.2–67.3, but [George's] guidelines would call for a sentence somewhere between two and six years, with a midpoint around four year[s] and four months." (*Id.*) George contends that if counsel had adequately and forcefully explained to him the strengths of the prosecution's case and the weaknesses of George's own testimony, he would have accepted the plea offer. (*Id.* at 25–28.) As discussed below, this is not an instance where the prosecution's evidence was overwhelming, and a conviction a near certainty. The victim's persistent pursuit of George favored the defense's contention that any sexual activity was consensual. Nevertheless, the jury ultimately credited the victim's testimony that she did not consent to having sex of any form with George on the night in question. Moreover, the record reflects that George was well aware of the risks of going to trial and was adamant about his innocence and unwilling to plead guilty to any charge that would have required him to register as a sex offender.

### B. Summary of the Pertinent Evidence from the Trial

#### 1. The Prosecution's Evidence

At trial, the victim, CF, testified that in 2001, she frequented the Green Leafe Cafe, the bar where George worked. (May 2, 2013 Tr. 18.) George would sometimes

4

drive CF home if she was not able to drive herself. (May 2, 2013 Tr. 18.) CF and George's friendship developed to the point of intimacy where they had sexual relations five or six times. (May 2, 2013 Tr. 18.) On April 1, 2011, George and CF again had vaginal intercourse and George tried to persuade CF to have anal intercourse, but she declined. (May 2, 2013 Tr. 21–22.) During that incident, George got slightly violent, attempted to choke CF and bit her in two places. (May 2, 2013 Tr. 21.) CF told George not to choke her. (May 2, 2013 Tr. 21.) Thereafter, George left CF a voicemail wherein he claimed that he had blacked out during the April 1, 2011 incident and did not recall what had happened. (May 2, 2013 Tr. 22.)

On April 8, 2011, slightly before midnight, CF went the Green Leafe Cafe with a friend. (May 2, 2013 Tr. 22–23.) While at the Green Leafe Cafe, CF repeatedly texted George telling him she wanted to talk. (Commonwealth Ex. 7.) George texted back, "I'm good, lose my number." (*Id.*) CF did not give up and continued to text George. (*Id.*) Upon leaving the Green Leafe, CF went to George's residence under the pretense of retrieving an earring she had left there. (May 2, 2013 Tr. 24–25.)

Upon arriving at George's house, she repeatedly knocked on George's door and texted him. (May 2, 2013 Tr. 26.) CF informed George that she was going to sleep outside his front door until George came out and talked to her. (May 2, 2013 Tr. 26.) After about twelve minutes, George came out and talked to CF, while they sat on a bench near his townhouse. (May 2, 2013 Tr. 26–27.) George then went back inside his townhouse. (May 2, 2013 Tr. 28.) CF knocked on his door and said she needed to use his bathroom. (May 2, 2013 Tr. 28.)

5

After CF used the bathroom, George ripped her wig off. (May 2, 2013 Tr. 31.) CF then told George she wanted to leave and that if he found her earring he could give it to her later. (May 2, 2013 Tr. 32.) George then punched CF in her left eye and dragged her across the carpet. (May 2, 2013 Tr. 34.) George then straddled CF and put his penis in her mouth. (May 2, 2013 Tr. 35.) CF bit George's penis. (May 2, 2013 Tr. 35.) George then got mad, removed CF's shorts and raped her. (May 2, 2013 Tr. 36.) CF repeatedly told George to stop and scratched his neck and chest. (May 2, 2013 Tr. 37.) George then penetrated CF anally while CF cried no, told him to stop and told him he was hurting her. (May 2, 2013 Tr. 38.) CF then urinated and uncontrollably defecated on George. (May 2, 2013 Tr. 39.)

George jumped up in shock, and CF ran into to the bathroom to clean herself up. (May 2, 2013 Tr. 39.) George pulled CF out of the bathroom by her hair and threw her around the living room. (May 2, 2013 Tr. 40.) George then poured hot sauce on CF. (May 2, 2013 Tr. 42.) After a prolonged struggle, CF was able to grab her phone and flee out the front door. (May 2, 2013 Tr. 48.) As soon as she got outside, CF called 911. (May 2, 2013 Tr. 48.)

CF went to a nearby friend's home and waited for the police to arrive. (May 2, 2013 Tr. 49–51.) CF provided a statement to the police and was taken to the Riverside Trauma Unit. (May 2, 2013 Tr. 50–51.) A nurse took photographs of CF's injuries which largely corroborated CF's account of the assault. (May 2, 2013 Tr. 51; Commonwealth Ex. 2.)

On cross-examination, CF acknowledged that on George's phone, she is identified as "Crazy Bitch." (May 2, 2013 Tr. 64.) CF also admitted on the night of the assault, she might have misrepresented to Officer Evans that George had invited her over to his apartment. (May 2, 2013 Tr. 65–66.)[1] Additionally, CF acknowledged in her initial statement to the police, she did not state that she had gone to George's townhouse to retrieve an earring or other personal belongings. (May 2, 2013 Tr. 70.) CF further admitted she had testified inconsistently at trial and the preliminary hearing about where and how she retrieved her phone before fleeing George's residence. (May 2, 2013 Tr. 82–83.) The defense also cross-examined CF with texts that she had sent to George that suggested she was inviting him to have anal sex with her prior to the night in question. (May 2, 2013 Tr. 86–88.)

Investigator Christopher Gibson testified that he responded to George's residence on the morning of the attack. (May 2, 2013 Tr. 102.) Upon arriving at George's residence, Investigator Gibson called George and told him he needed to talk to him. (May 2, 2013 Tr. 103.) George initially lied and told Investigator Gibson that he was not home. (May 2, 2013 Tr. 103.) George also told Investigator Gibson, "that it was a big mess, it had gotten out of hand and that he knew he was going to jail." (May 2, 2013 Tr. 104.)

---

[1] CF's friend, Kym Byrd, also testified that CF told her that George had invited her over to his apartment. (May 2, 2013 Tr. 121.)

7

Officer Daniel Jackson testified that he questioned George on the morning of the assault. (May 2, 2013 Tr. 107, 110.) During that initial interview, George stated that he turned down CF's sexual advances. (May 2, 2013 Tr. 111.)

### 2. The Defense

George testified that he and CF had a sexual relationship that he was trying to end in the months before the April 8, 2011 incident. (May 2, 2013 Tr. 189–95.)[2] In the early morning of April 8, 2011, CF followed George back to his apartment. (May 2, 2013 Tr. 198–99.) CF then sat outside George's door for an hour and a half, yelling, knocking, and texting. (May 2, 2013 Tr. 200–01.) George hoped by ignoring her CF would give up and go home. (May 2, 2013 Tr. 201.) When that did not happen, George went outside to let her talk, in the hopes that would give CF what she wanted. (May 2, 2013 Tr. 201–02.) When George realized he could not diffuse the situation by letting CF talk and letting her know that he did not want a girlfriend, he went back into his apartment. (May 2, 2013 Tr. 204.)

George locked the door and CF immediately began banging on the door and stating that she needed to use the bathroom. (May 2, 2013 Tr. 205.) George let her in to use the bathroom, but he was skeptical of her motives for wanting to gain access to the apartment. (May 2, 2013 Tr. 206.) After using the bathroom, CF started coming on to George. (May 2, 2013 Tr. 206.) George thought CF's motives for insisting on hanging around were because she wanted to have sex. (May 2, 2013 Tr. 206.) George thought if

---

[2] Jessica Ronan, George's manager at the Green Leafe, testified that prior to April 8, 2011, CF pursued George regularly at work. (May 2, 2013 Tr. 180–82.)

8

they had sex, CF might agree to leave. (May 2, 2013 Tr. 206–08.) George admitted that he and CF then had "rough," consensual, oral, vaginal, and anal sex. (May 2, 2013 Tr. 208–09.) The defense also referred to text messages from CF that tended to corroborate George's assertion that he and CF previously had engaged in rough sex. (May 2, 2013 Tr. 209–10.)

After George climaxed, CF became very upset. (May 2, 2013 Tr. 210.) George expressed that he wanted her to leave. (May 2, 2013 Tr. 210–11.) George and CF then got into an altercation that involved shoving, kicking, swinging shoes, CF pouring a beer on George and George pouring hot sauce on CF. (May 2, 2013 Tr. 212–13.) After much physical struggling George was able to pick CF up and remove her from the apartment. (May 2, 2013 Tr. 213.) One of the last things CF said as she left was that she was going to call the police and tell them George had raped her. (May 2, 2013 Tr. 215.) However, on cross-examination, George admitted that he could not remember if he had ever told an investigator about CF's parting comment. (May 2, 2013 Tr. 234.)

The jury credited CF's version of events and convicted George on all counts.

### B. The State Habeas Proceeding

On state habeas, during the evidentiary hearing, George acknowledged that counsel told him about the plea offer. (July 6, 2017 Tr. 18.) George, however, acknowledged that he really was not concerned about accepting a plea that would reduce his sentencing exposure and admitted, "Time was the least of my concerns. I can't say I wasn't concerned, but that was the least of my concerns." (July 6, 2017 Tr. 19.) George was most concerned about being labeled as a sex offender. (July 6, 2017 Tr. 19.) George

9

admitted to telling counsel "doing 30 years or 3 years is no different." (July 6, 2017 Tr. 27.)

George further acknowledged that counsel told him George's initial lies to the police would present a "hurdle" for the defense. (July 6, 2017 Tr. 39.) George also acknowledged that counsel told him that the evidence against him was "strong." (July 6, 2017 Tr. 47.)

On multiple occasions, Richard Collins, George's trial counsel, informed George of the inherent risks of taking something to the jury. (July 6, 2017 Tr. 75.) Counsel also relayed that George "was adamant that he did not want to accept" the plea offer. (July 6, 2017 Tr. 80.) Counsel told George that "he had a realistic chance of losing if he went to trial." (July 6, 2017 Tr. 96.)

The Circuit Court found that George failed to demonstrate counsel performed deficiently in conveying the plea offer and failed to demonstrate a reasonable probability that he would have accepted the plea offer, but for some deficient advice on the part of counsel. Specifically, the Circuit Court made the following findings:

> First, that the defendant presents as average or above average in intelligence. There is no question here with this particular defendant of a cognitive problem or understanding of what was going on with the case at all. He's a very articulate witness.
> Counsel gave an honest assessment of the trial. It was all or none, 30 years or acquittal. And it was also clear that the sentencing range was life, but I guess nobody thought that that was really on the table. Somewhere around the minimum or acquittal. Counsel gave an honest assessment of the plea time based upon the guidelines. The defendant was well aware of the sex registry throughout these proceedings. The discussion about the plea agreement was several days before trial, so there was plenty of time to discuss it. And that's important too because it was clear and the defendant testified that he was in constant contact with his attorney. So, you know, had he any

10

questions about this or any second thoughts, whatever, he knew how to get in touch with his attorney. And consistent with the case you're talking about out of Maine, had he had any questions of this attorney, "What should I do? What about this?," he certainly had access to his counsel and didn't avail himself of that.

Counsel gave a sentencing range under both the plea agreement and the trial. Counsel -- client knew there was a credibility issue. It was an all or nothing credibility issue and that's the way the case stacked up. Counsel knew of all the evidence and its credibility issues, but counsel here today have made a strong argument that there were issues that favored the Commonwealth but ignored some things that I think his client was banking on which affected the victim's credibility. One is that she was pursuing him. Two, she was intoxicated. Three, they met at a bar. Obviously, she could be categorized as a barfly or something of that nature. There are those issues in the case. And four, there was a prior relationship, you know, I think three or four prior instances of sexual contact between these clients, perhaps more that I'm not aware of. Those were all part of the defense case. So to argue here today that the Commonwealth's case was very strong because of consistency and what have you, they had some arrows in their quiver too to attack her credibility. So again, it's how the counsel evaluated the case. It's a credibility case. It's all or nothing.

The client admitted that he had four long meetings with his attorney and in constant contact throughout. The attorney had permission to pursue the plea offer. He testified that he had permission before he contacted the Commonwealth to pursue a plea offer. He obtained and he conveyed the plea offer. Defendant admitted that just the day before they had their motion in limine, which was unsuccessful, and that discouraged him about his chances at trial. So he is very intelligent in realizing when it gets to credibility, we were really counting on her prior complaint and then we lost that, and that hurt the credibility case. He was aware of that. [George] candidly admitted that his main concern throughout this was the sex registry, not the time. Now, in hindsight perhaps that wasn't such a good decision, but he admitted that was his thinking process, his thought process.

And it comes down to, his primary complaint today is that counsel did not talk him out of the trial, should have forcefully or more forcefully suggested that he take the plea agreement. And, you know, ironic, but I think we would be here today had he forced him into the plea agreement, talked him into it, second-guessing that.

It's clear that *Strickland* applies to plea offers. *Strickland* is a two-prong test. It's a test of performance and prejudice. I certainly think Mr. Collins' performance was sufficient, far above the minimal standard in this case. It was a very thorough representation. He presented very well here today without his file. And the prejudice, I think that the defendant or the

11

> petitioner here today undercut the whole issue of prejudice by saying his goal from the beginning was to avoid the sex registry. That was really important. What goes on the Internet was important to him and essentially it was his decision to roll the dice in the case.

(July 6, 2017 Tr. 125–28.)

### C. Ineffective Assistance in the Context of Plea Negotiations

To demonstrate ineffective assistance of counsel, a convicted defendant must first show that counsel's representation was deficient, and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, a convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, the Court need not determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

The two-part *Strickland* standard applies to claims arising out of the plea-bargaining process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *see Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). "During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" *Lafler*, 566 U.S. at 162 (quoting *McMann v.*

12

*Richardson*, 397 U.S. 759, 771 (1970)). Generally, claims of ineffective assistance of counsel during the plea process fall into three categories. First, "the [complete] failure of a defense attorney to timely inform his client of a plea offer constitutes unreasonable professional assistance." *United States v. Brannon*, 48 F. App'x 51, 53 (4th Cir. 2002) (citing *United States v. Blaylock*, 20 F.3d 1458, 1465–66 (9th Cir. 1994)); *see Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003). Second, a defense attorney's inaccurate advice or misinformation in conveying a plea offer may constitute deficient assistance. *Brannon*, 48 F. App'x at 53 (citing *Paters v. United States*, 159 F.3d 1043, 1047–48 (7th Cir. 1998); *see United States v. Merritt*, 102 F. App'x 303, 307–08 (4th Cir. 2004); *Wolford v. United States*, 722 F. Supp. 2d 664, 688 (E.D. Va. 2010) (concluding that counsel was deficient where he "misled [the petitioner] into believing that she had some possibility of prevailing at trial on the basis of several non-viable defenses"). Third, incomplete advice in conveying a plea also may provide a basis for a claim of ineffective assistance of counsel. *See Wolford*, 722 F. Supp. 2d at 689 (concluding that "counsel's incorrect and incomplete legal advice to [the petitioner] during the plea negotiation process was objectively unreasonable" (citing *Strickland*, 466 U.S. at 688); *see also United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992) ("[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer." (citing *Hill*, 474 U.S. at 56–57; *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948))).

In the plea context, to demonstrate prejudice, George also must show that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Merzbacher v. Shearin*, 706 F.3d 356, 363 (4th Cir. 2013) (quoting *Hill*, 474

13

U.S. at 59). Courts generally reject a defendant's self-serving statement that, but for counsel's misadvice, the defendant would have accepted the plea offer, unless such an assertion is coupled with some objective evidence tending to support the defendant's claim that he relied on counsel's erroneous advice. *See Merritt*, 102 F. App'x at 307–08 (citing *Gordon*, 156 F.3d at 381); *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991); *see also Fields v. Atty. Gen. of Md.*, 956 F.2d 1290, 1298 n. 19 (4th Cir. 1992).

Here, the Circuit Court reasonably concluded that George failed to demonstrate deficiency or prejudice. With respect to deficiency, counsel informed George of the plea offer and George's sentencing exposure. Although George faults counsel for failing to belabor the strengths of the prosecution's case when discussing the plea, it is plain that George knew the prosecution's case against him, while not overwhelming, was strong. Equally strong, however, was George's contention that he was innocent.

Although "reasonable professional conduct does not under all circumstances require a lawyer to give an explicit opinion as to whether a client should take a plea offer," *Purdy v. United States*, 208 F.3d 41, 48 (2d Cir. 2000) (citing *Jones v. Murray*, 947 F.2d 1106, 1110–11 (4th Cir. 1991)), it does require counsel to provide his client with a candid evaluation of the Government's case. *See Jones*, 947 F.2d at 1111 ("'[T]he lawyer should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome.'" (quoting II American Bar Association Standards for Criminal Justice, Standard 4-5.1 (2d ed. 1986 Supp.)) (alteration in original).

The Supreme Court has recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. As the Court stated:

> Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. . . . For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.* (citation omitted). "Counsel [is] entitled to rely on the truthfulness of [his or her] client in deciding how to . . . advise [his or her] client." *Royal v. Netherland*, 4 F. Supp. 2d 540, 556 (E.D. Va. 1998) (citing *Barnes v. Thompson*, 58 F.3d 971, 979–80 (4th Cir. 1995)). As the Fourth Circuit has explained:

> The constitutional argument that counsel should, instead, presume that his client, particularly one who is behaving in a cooperative and forthcoming manner, is being deliberately misleading . . . runs counter to this most basic premise. It would also place counsel in an impossible position-unable to trust the word of the client . . . and always subject to professional challenge . . . .

*Emmett v. Kelly*, 474 F.3d 154, 168 (4th Cir. 2007); *see United States v. Ausmus*, 774 F.2d 722, 727 (6th Cir. 1985) (noting that "[p]rofessional standards do not require counsel to disbelieve a client and check with other sources unless counsel has a basis for such disbelief"); *Irizarry v. United States*, Nos. 8:05–CV–61–T–30MAP, 8:03–CR–22–T–30MAP, 2006 WL 3132421, at *4 (M.D. Fla. Oct. 31, 2006) ("It is not unprofessional for an attorney to believe what his client tells him."); *cf. Beach v. Moore*, No. 3:06 CV

478, 2007 WL 1567669, at *14 (N.D. Ohio May 24, 2007) (citation omitted) ("It is not ineffective assistance of counsel to attempt to clear one's client from suspicion only to find out that the same client was not being entirely truthful with his attorney or investigators."). Therefore, in situations where a client is less than forthcoming with his attorney, "whether characterized charitably as lack of candor or as a lie," counsel cannot reasonably be found to have acted deficiently by relying upon the client's representations. *Tyson v. Keane*, 159 F.3d 732, 736 (2d Cir. 1998); *see United States v. Pitcher*, 7 F. App'x 119, 120–21 (2d Cir. 2001) (noting that "[a]ny deficiency in counsel's advice . . . [may be] properly attributable to [the client's] own dishonesty in dealing with his lawyer" (citing *Tyson*, 159 F.3d at 736–37)).

The law rather strongly teaches that it is the client who "ultimately must decide whether to accept or reject a plea agreement." *Mann v. United States*, 66 F. Supp. 3d 728, 739 (E.D. Va. 2014); *see Purdy*, 208 F.3d at 45 (citation omitted) (noting that "the ultimate decision whether to plead guilty must be made by the defendant"); *United States v. Dailey*, Nos. 3:09–CR–233–3, 3:12–cv–362, 2013 WL 1768053, at *4 (E.D. Va. Apr. 24, 2013) (noting that "the professional norms surrounding plea negotiations require defense counsel to[, *inter alia*,] permit the client to make the ultimate decision" (quoting *Clark v. United States*, No. 07cr281, 2012 WL 253436, at *2 (D. Md. Jan. 26, 2012))). The lawyer is to advise about options. *See Jones*, 947 F.2d at 1111. And, in so doing, defense counsel is not obligated to recommend a particular choice, or to press the client to change his mind or pressure the client into one choice or the other. *Id.; see also Purdy*, 208 F.3d at 45 (internal citations omitted) (noting that "a lawyer must take care not to

16

coerce a client into either accepting or rejecting a plea offer"); *Carillo-Morales v. United States*, 952 F. Supp. 2d 797, 804 (E.D. Va. 2013) (concluding that "an attorney is under no obligation to recommend a particular course of action to a client" (citing *Jones*, 947 F.2d at 1110)); *Jackson v. United States*, 638 F. Supp. 2d 514, 580 (W.D.N.C. 2009) (concluding that ineffective assistance does not occur when "counsel deci[des] 'to refrain from a vigorous attempt to change his client's mind'" (quoting *Jones*, 947 F.2d at 1111)). Given George's consistent professions of innocence of the crimes charged in the indictments and his adamant refusal to consider any plea that would label him a sex offender, the Circuit Court reasonably rejected George's claim that counsel performed deficiently in discussing the plea offer with George.

Additionally, the Circuit Court correctly concluded that George failed to demonstrate prejudice.[3] "A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later [habeas] claim that he would have pleaded guilty if only he had received better advice from his lawyer." *Sanders v. United States*, 341 F.3d 720, 723 (8th Cir. 2003) (citing *United States v. Stevens*, 149 F.3d 747, 748 (8th Cir. 1998); *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995)); *see Chesney v. United States*, 367 F.3d 1055, 1060 (8th Cir. 2004). In this regard, George did not merely stand on his right to require the prosecution to prove his guilt. Instead, George took the stand and disputed

---

[3] While George was willing to plead to a misdemeanor or some other minor charge of misconduct, he was adamant that he was innocent of the felony charges of sexual misconduct of which he stood indicted.

the evidence which reflected that he had raped, forcibly sodomized, and abducted CF. Given these circumstances, George fails to demonstrate any reasonable probability that he would have accepted the plea offer had he received better advice from counsel. *See Jackson*, 638 F. Supp. 2d at 581–82 (concluding that in light of the petitioner's expressed desire to fight the charges, he failed to demonstrate a reasonable probability that he would have pled guilty during the window of opportunity in which to plead guilty); *Goudie v. United States,* 323 F. Supp. 2d 1320, 1335–36 (S.D. Fla. 2004) (rejecting petitioner's claim that he would have accepted when, at the time the plea was open, the petitioner insisted he was innocent). Accordingly, George's claim will be dismissed.

## IV. CONCLUSION

George's claim will be dismissed. The Motion to Dismiss (ECF No. 5) will be granted. The § 2254 Petition will be denied. The action will be dismissed. A certificate of appealability will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/
HENRY E. HUDSON
SENIOR UNITED STATES DISTRICT JUDGE

Date: Aug 5 2015
Richmond, Virginia

18